Good morning, Your Honor. Good morning, Judge Rawlinson, Judge Acuda, Judge Bybee. My name is John O'Reilly of the law firm of O'Reilly Law Group. I am here representing LID Acquisition, along with my co-counsel, Mr. Timothy O'Reilly, who is at counsel table. Also present is Mr. John Plunkett, who is the representative for the client. I would first like to thank the Court for the previous courtesy, extending the time for this argument. It's been most appreciated and necessary. I would like to reserve up to five minutes for rebuttal, if that's appropriate. By way of introduction, I think it's obvious from the record, but I will just briefly touch on it. We're here not on a trial, but rather on summary judgments that have been the result of proceedings that had very limited discovery. I believe it's clear that we're here for a de novo review, a review of both the facts and the law that applies to this $15 million dispute. The dispute, we can, I think, clearly summarize as a dispute between two secured parties, Credit Suisse on one side and our client on the other. Credit Suisse has had counsel of record in earlier court proceedings. Their position, however, has been advocated by the appellee in this case throughout the proceedings of the bankruptcy court to the present time. The $15.5 million that's in dispute was money that was originally lent by Wells Fargo. I believe the record is clear that it was the form of a loan and the type of a loan that it's not a question of is it going to be repaid, it was a question of when it was going to be repaid. Unlike many loans, it was a loan that was designed to facilitate a tax-free municipal bond that was fully funded, that was held in trust by the agent of the city of Henderson. There was money there, there's money to pay. Unfortunately, in the midst of the process, a bankruptcy occurred, and rather unique issues arose that were not anticipated, certainly, by the lenders or by our client who purchased the loan from the lenders, Wells Fargo. Two issues, I believe, in spite of the thousands of pages that are before you, the issues are fairly simple. There's two LIDs, local improvement districts. One is T-16, the other is T-12. Let me touch briefly on T-16. The argument on T-16 is that we're not entitled to anything under the loan that's on T-16. Why? Because there was a termination statement that was filed terminating our security interest and, therefore, causing it to lose priority. It was refiled, but causing it to lose priority to Credit Suisse. Judge Regal at the bankruptcy court said, but for that, you would have a successful claim under T-16. Do you agree with that? Absolutely not, Your Honor. And let me refer, and thank you for asking, let me refer the Court to SCR 1845, which is that purported termination statement. And before doing so, I would refer the Court to the Nevada revised statutes. No matter which version you use through the years, it provides that an amendment to a filing can be filed by a secured, on behalf of a secured party, authorizes it. There's no, absolutely no evidence of any authority to file what I'm about to read, which is the termination that's not filed by our client. It's filed by somebody named Donald or Donna Klenke, UCC Direct Services, 2727 Allen Parkway Suite 1000, Houston, Texas. Termination. May I ask you, was the termination filed before your client had an interest in the security? It was filed about the same time the transaction was going on. I think the short answer to that, I think, is no, if we look at the exact dates of the records, although they were in and about the same time. But the, I think the key element is that for this termination to be effective, no matter which case we have it filed, to end up terminating our interest. I'm curious as to whether or not the statute equates amendment with termination. Equates what, Your Honor? Amendment with termination. I think it does, Your Honor. I think that's my understanding. You're amending basically the filing. By, if you look at the form that is the SCR 1845, it talks about various alternatives from termination to continuation to assignment. And the heading on it is UCC Financing Statement Amendment. So are you arguing that Wells Fargo didn't appropriately file a termination statement, or are you arguing that it was invalid because your client didn't give permission? Well, Your Honor, first of all, we're arguing that there was a summary judgment granted, and there's no finding of fact, no facts, no discovery on this issue. So at a minimum, it should be remanded to find out what the facts are. Two, based on the record we have now, there's no indication of any authority by our client or even by Wells Fargo in terms of authorizing this termination to be filed. But you're saying neither Wells Fargo nor your client authorized this termination statement to be filed? I can't speak for Wells Fargo. I can certainly speak for our client. Our client did not authorize it. Our client was the, at that time, had owned the loan, and clearly did not authorize it. I thought the termination was filed just shortly before you closed with Wells Fargo. Your Honor, if it was, it was minutes or hours, or because the transaction went down to where we paid the money and we got the loan documents. So why isn't this an argument between you and Wells Fargo? It could be, Your Honor. Why does that affect the proceedings here, if this is an argument between you and Wells Fargo? I don't think it is, Your Honor. Whether it's us or whether it's Wells Fargo, we should have priority. And I think the record is clear we should have priority over Credit Suisse, for a number of reasons, not the least of which is the point I'm making now. Right. But if the bankruptcy court found that Wells Fargo had terminated its interest, that put Credit Suisse ahead of you in line. And, you know, we've got documents that appear to be valid, all filed with the Secretary of State, that appear to have been accepted by the Secretary of State. Has anybody tried to go back to the Secretary of State and say these were fraudulently filed? Your Honor, they were not filed by us. The Secretary of State takes what's filed as we know. Whether they like it or not, they file it and they stamp it and it becomes a record. Did you try to have the termination declared fraudulent? We have not, Your Honor, not in this process. The question, Your Honor, I think before this Court, we did, Your Honor, as the record indicates. Right. We sued and that's who's now been dismissed. So whatever you decided between you and Wells Fargo is not before us. That's correct, Your Honor. But I'm still trying to figure out why this isn't an argument between you and Wells Fargo that should be conducted someplace else rather than in this proceeding. Your Honor, I think for the simple reason whether it's us or Wells Fargo sitting here, there's no indication on this record there's any authority to terminate this security agreement and this priority. There's no authority in this record. We're here on summary judgments and not on any discovery, not on a trial of any substance, not on any trial at all. Whether it's us or Wells Fargo, there's no authority for termination. But there are other arguments, too, Your Honor, that perhaps before we're out of my time addressing the termination argument, I think the point just remains that there is no authority in this record anyplace that our client authorized the termination of its security interest. Zero. And you're stating that your client owned the security interest that had been assigned at the time the termination statement was filed? I don't have the exact moment in time, Your Honor. It all happened in a matter of days. I believe that the termination was filed after we'd closed with Wells Fargo on the loan. And certainly we didn't know about it until the — The assignment is not recorded until April 7th. The termination was filed on March 31st. Your Honor, it was part of the closing process. And it's a matter of days, and I can't recite in the record what day what happened. The bottom line, my point at this point in time is that there was no authority. But if I may — If we determined that at the point in time when the termination was executed, Wells Fargo was actually the owner of the security interest, would your argument still be there was no authority to file? Yes, Your Honor. There's no authority in this record that anybody authorized this outfit in Texas to terminate. Again, we're here on summary judgment. There's no authority I know of anyplace in this record that says — I understand that we're here on summary judgment, and I'm very curious as to what the truth is. I'm just wondering why the bankruptcy judge has to resolve that when all the filings are with the secretary of state. It looks like this — again, it looks like this is an argument between you and Wells Fargo that you ought to take outside and resolve someplace else rather than before the bankruptcy court. Well, Your Honor, the complaint in the bankruptcy court was not brought by us. It was brought by the appellees in this case.  That's where we were — But you come into the bankruptcy court and said the assignment that's apparent on the records of the State of Nevada is not valid. And I'm wondering why the bankruptcy court in the context of the bankruptcy at Lake Las Vegas has to resolve what appears to be an argument between you and Wells Fargo. Well, Your Honor, to determine the actual validity and the authorization of the termination, they have to reach that final fact. Otherwise, if it's not validly terminated, the priority continues. But I think it's simpler than that, Your Honor. Let me go to what I think is the next issue. Both T-16 and T-12 are governed by default remedies. The agreements between the parties clearly identify what happens if there's a default. And I refer the — Who drafted those agreements? Do you know? I don't, Your Honor. It was before our client was involved. I would only suspect that it would be the bank, since the bank prepares loan documents typically when you go to a bank for a loan of any size, let alone $15 million worth of loans or two sets of loans. But referring to Document 142 and Document 140, T-16 and T-12 both, five and a half months, five and a half months before the bankruptcy was filed, had a notice and irrevocable direction to pay that was served upon and received by the city of Henderson five and a half months before the bankruptcy filing. The termination and the direction to pay was the remedy that was provided to vest in our clients the ownership of that collateral. That's what the agreement of the parties was. We can go through a whole lot of discussion, a whole lot of argument about what proceeds were, and a whole lot of discussion about all the case law. Point is, we don't get there, because the default remedies that are clearly articulated by the parties, clearly agreed to, have been executed and have become reality. I would further turn the Court's attention to those documents where an entity called LLV-1 LLC, Transcontinental and so on, in essence the predecessor of the bankrupt estate, says in part, There's not an issue about collateral. It basically is a foreclosed loan. It's basically owned by our client. There is no evidence to indicate that we should be dealing with the issues other than the foreclosure, the execution on these rights, which occurred as a result of the default. Did you want to say some time for rebuttal? I did, Your Honor. Thank you. Thank you. Good morning, Your Honors. May it please the Court. I'm David Stern. I'm appearing on behalf of the appellees, who are not credit suites, but we'll pass that point for the moment. Let me deal first with the points made by my colleague in opposition to the decisions below. The first point he made was that there was no evidence that the termination statement was filed by the secured party of record. As Judge Bivey pointed out, the secured party of record was Wells Fargo. Furthermore, forgetting even the presumption of regularity on the filed documents, there were several points, including in appellant's opening brief, and the point below was not that Wells Fargo was not authorized, but that it erred. I'm going to quote from the opening brief at page 37. However, Wells Fargo then inadvertently terminated its financing statement in the T16 acquisition agreement and related payments on May 31, 2008. Judge, do you know if – I thought I heard two points. One is that the document itself, the termination statement, was not on its face authorized by Wells Fargo, or there was something facially wrong with it. The second point I heard was that at the time Wells Fargo filed it, Wells Fargo wasn't really the owner of the security interest. So could you address those two points? Yes, Judge, I can address both of them. In terms of who it was filed by, again, in addition to the fact that we have extrinsic evidence that was submitted at the time of the summary judgment and uncontradicted as to the fact that Wells Fargo was the one that filed it, there are other filings by Wells Fargo that are a matter of record that are virtually identical. Same, you know, same UCC direct services. All the indicia, if you look at the three documents, they're all the same. The termination statement is found at SER 1845. And the prior statements that were filed by Wells Fargo are at Excerpt of Record 146 and 147. In addition, there was a complaint, as Judge Bidey pointed out, filed by the appellant against Wells Fargo, and that complaint was part of the record and said that on or about March 31, 2000 ---- What page on the record is that? I'm sorry? What page of the excerpt? Oh, I'm sorry. It's SER 1958 is the exact, and it's starting at line 2 of that page. Okay. It's the complaint against Wells Fargo, and it begins similar to the brief. On or about March 31, 2008, Wells Fargo filed a UCC termination statement. And in connection with that ---- Did that complaint at any point say that Wells Fargo was not authorized to file the termination? Not to my knowledge. I mean, the entire complaint is a matter of record. And I'm not going to read it while I'm standing up here. I can't. But it's right there. It's in the few pages before and after the site I just gave you. And there is no evidence whatsoever that Wells Fargo was not the secured party at that point. Indeed, as a matter of public record, Wells Fargo was the secured party at that point. And as Judge Biby pointed out, that was true at least until April the 7th. So we have a termination, and we really have a situation that is very similar to cases that this Court and other courts of appeal have addressed, cited in our brief. Pacific Trencher is the occurring versus somebody, but it's In re Pacific Trencher, which I believe a 1988 decision of this Court where a secured party in effect checked the wrong box. That's the essence of what the argument is here. And we don't have any evidence that they checked the wrong box. We don't have any evidence at all. There was no evidence submitted. And contrary to the statements made by my colleague, we do not have a situation here in which we did not have discovery. We do not have a situation here in which any party filed a Rule 56F, now 56D statement saying, I need more discovery, and here's what I will show. We just don't have that. So from the standpoint of the record below, the record is replete with evidence that Wells was the party of record and terminated. And, therefore, we fall right within what are standard UCC rules that basically say, you're done. If there had been an attempt below and there was no attempt whatsoever to show that Wells Fargo was unauthorized, that this was a, you know, the equivalent of a wild deed, then we'd be in a different circumstance. But the Code actually says, the Uniform Commercial Code says, basically, if you can show that the, it was an authorized filing, and it was, it may have been a mistaken filing, but it was an authorized filing, it's game over and the termination statement is effective. That was the result below. And, you know, one can argue as to what was or was not fair, but this is a situation in which it was very evident what could have been done and what should have been done. Turning to T-12 for the moment, the opposing counsel makes the argument that before the bankruptcy, the creditor triggered the default notice to pay provisions and, therefore, by force of triggering them, became the owner of the security interest. Again, we've got, you know, a long line of authority, including out of this court. I believe it's about 1988 of the contractor's equipment, and there are five factors that one utilizes in examining a security document to see whether or not it is intended to be for security or is intended as an absolute assignment. All that occurred here was a very, very conventional, and the bankruptcy judge, I think, said it was an enforcement device. What happens is you have, you know, a security interest, and when the debtor defaults, the bank notifies the various account debtors, pay me, don't pay the debtor. That doesn't effect an assignment unless you look at the other five factors, and we have not only the contractor's equipment case, which is, I believe, a case that comes out of Arizona but has been cited more generally, we also have a district court decision from 1981 out of this district, Valley Bank, and it's the same thing. It's that creditors, secured creditors frequently and before the UCC used lots of terminology to frame a security interest. They used terms like assign and convey and pledge and hypothecate, but ultimately the UCC has a very, very simple formula that says whether or not it was or was not intended as a security agreement or was it intended as an absolute assignment. Getting to the obvious question of, well, what kind of evidence do we have, no evidence was submitted below by the other side who could have submitted evidence that said, aha, here, we really intended it as an assignment, and here's evidence of that fact. I don't think that's a tribute to their candor. I mean, I don't think they could have come up with evidence, and I don't think they put in, obviously, nonsensical evidence. But the simple fact is that the Court had below it documents that specifically said this is intended as collateral for security purposes. It's a rather standard form of security agreement. And the notion that this is somehow an absolute assignment is simply belied by the record, and there's nothing to the contrary. So whether one looks at T12, T16, or the two in combination, the notion that there was an assignment here in a conventional, in the true sense of really assigning and walking away, that just didn't happen. This was a security arrangement, and therefore, the UCC and the Bankruptcy Code both come into play in this circumstance. And you were going to ask? You also address the argument that under 109N, the transfer by the government is exempted from the regime of the UCC or UCC-9, and you rely, I think, in part on the official comments. Those have not been codified, though I guess the Nevada Supreme Court looks at them. So why should we assume that the Nevada Supreme Court would enforce the official comments, which are different, it seems to me, than the plain language of Subsection N? Well, I think the answer to that is that the comments are frequently looked upon as interpretive tools. We do have cases with it from other Supreme Courts, including the Washington Supreme Court that was cited with approval by this Court at one point. The Brazier Products case. We have this exception existing. And you look at the legislative history, which I always do with trepidation. I didn't do it when I first started practicing law, but do it now. But you look at the legislative history, and it's pretty clear what exactly that is intended to do. When the State of Nevada or when one of its municipalities engages in a secure transaction with bondholders and pledges, for example, tax receipts, that particular transaction does not fall within the Uniform Commercial Code as a result of municipal finance law and a long, long line of cases that say that's really different. This is not that situation. This is a lot like the Brazier Products case. You have a contract between two private parties. It's between either one of the debtors, either LLV-1 or LLVJV, and Wells Fargo. Neither one of them is a government entity. The money is ultimately going to come from the government to pay Wells Fargo, but that's once removed. That is not a government borrowing. And what you would have here, or what was being argued here, is that if a private party enters into a secure transaction with a bank and has a large number of receivables, as it often will, what this rule, if it were applied to government, were applied broadly, would say is that the secured creditor files a UCC-1 that works as to all of the various private parties that somebody is dealing with, but doesn't work as to government receivables. So if you pledge, by way of example, receivables from private hospitals and publicly owned hospitals, you would say that it's good as to the private hospitals. So one thing that neither of the briefs addressed is, so what would happen if it wasn't applicable to the government receivables? I take it it would go to a precode rule, and do we know what that is? You know, we obviously, we honestly did not explore that. I'm not sure what the precode law would be. Again, we, were this Court to go down that particular avenue, it would go down an avenue that is, that has not been trod before. It would truly be a road not taken. And I think the road is not taken because, as Brazier Products points out, you really can't have this sort of distinction, particularly with a government as ubiquitous as ones are these days. You're constantly dealing with government as well as nongovernment. So the fact that one of us, for example, pledges a bunch of receivables that we may have. A law firm pledges receivables, and some of its clients are public entities, and some of its clients are private entities. Somehow you'd have a different rule. It doesn't work that way. You just look at the fact that a law firm is a private company. The bank is a private company. That particular subsection of the UCC just doesn't apply. And the default rule is the UCC does apply in commercial transactions. So I'm sorry I can't answer your question as to what would happen if the government exception applied. By the way, I'm also prepared to answer if the Court has any questions. I know my colleague did not raise it. The 552 issues under the Bankruptcy Code, we haven't discussed that. Does the Court have any questions about that? Because I'd be happy to answer it, but I also don't want to take up time needlessly. Here's not. Then I will not use all my time, and I thank Your Honor very much. Thank you. Rebuttal. Thank you, Your Honors. Mr. Stern has indicated that the Wells Fargo issues decided not in our favor, then done. That's just the beginning. It's not done. At worst-case scenario, if Credit Suisse has a valid lien, which is another series of questions of facts, we would at worst be in a second position. If, as he would encourage you to do, we ignore the default remedies and default documents. Talked about them before, but I'd like to read to you just the one sentence or so from the second page. Signed by the City of Henderson. This is document 143 and 140, as they relate to T-16 and T-12. The City of Henderson, Nevada, as a party to the acquisition agreement, acknowledges receipt of the foregoing notice and irrevocable direction to pay, and agrees that until it receives written notice from Wells Fargo, now that Wells Fargo's interest in the payments is terminated, it will remit to Wells Fargo in accordance with the foregoing notice all payments that otherwise would have been due directly to contractor. That was the agreement. That was the agreement set forth between the parties. It was the default remedy. It was executed upon and reconfirmed by that document in regard to both matters. The question is, why won't the city do it? They agreed to do it. Our client is putting money into the project. There have been improvements in the project. There's a whole series of facts that relate to those improvements. How much was done? Why didn't they submit to the City of Henderson for payment? All those, as you'll see in our brief, are a series of facts that have not been addressed, including who is Credit Suisse Cayman Islands Branch. It was never established they were even a legal entity, let alone being entitled to priority. Again, I remind the Court respectfully that we're here on two summary judgments without trial. The time that I've got left doesn't allow us to go through all the facts that exist in terms of questions of fact, but there are multiple, as we've identified in our brief. We also believe, Your Honor, in response to the questions about the government exception, that the statutory language is very clear. If the world has to go back and read all the case law that we have to look at in all the legislative history to interpret the clear meaning of the statute that is on the books, it's going to create more confusion than is going to help. But what would happen if the government exception was applicable? How would that help you? I think all the arguments, Your Honor, that we've made in terms of the applicable provisions of the Uniform Commercial Code would not be there. We'd be back to clearly with the agreement of the parties without having to have it translated by what Mr. Stern and his clients have done in terms of basically saying we're going to ignore the operative documents and use the Uniform Commercial Code instead, which I believe you can do both and come to the same result that preserves our clients' $15.5 million interest in what's been invested in Lake Las Vegas in terms of improvements. All right. Thank you, counsel. Thank you to both counsel for your arguments in this interesting case. The case is submitted for decision by the court. The final case on calendar for argument today is Everest National Insurance Company v. Evanston Insurance Company.
judges: Rawlinson, Bybee, Ikuta